Please call the next case. Case 4-1305A4. Paula Moore, Workers' Compensation Commission. Good morning. Good morning. Counsel, you may proceed. If you may, please, the court. First of all, I don't know what happened, but I don't think that I included a statement of facts in my brief. It may just be my copy. If not, I'd like to go through the facts real quick right before we start. I think we understand the facts. Pardon? I think we understand the facts. I don't think they hit the issue. Okay. Your Honor. If you would, for the record, please introduce yourself. Oh, I'm sorry. Andrew Petty for the petitioner and appellant. Thank you. Your Honor, this case is really about a couple of things. The notice issue, like the last case, came up in this case. Well, that is critical, isn't it? Can we address the notice issue? Sure. The notice issue basically is impossible. It's impossible to reconcile the finding in the notice issue in this case, while also sustaining a finding on the other issue in this case, which is accident. The test for manifestation in a repetitive injury case like this is the date at which a person knew or should have known, and that's a lay person, that the injury was related to their employment. And you can't make a finding that a person should have known that this was related to their employment, and that it was related to their employment, and then also make the same finding in the same brief that it wasn't actually related to their employment. When the commission has to get all these experts and witnesses and things, and then eventually comes out to the conclusion that the... Why can't they do that? They can turn around and they can issue an opinion that said, you never proved there was a causal connection between your condition of ill-being and your employment, but oh, by the way, if you did, you never gave notice anymore. Why can't they do that? In a repetitive injury case? Yeah, why can't they do that? Because you've got to prove... Well, I mean, I guess they did. Well, that's exactly what they did. They turned around and said, you never proved that you suffered a repetitive trauma by reason of the work that you did, because they believed Dr. Coleman over Dr. Price, finding that Dr. Coleman at least knew what her job duties were when Dr. Price didn't, and then turned around and said, and by the way, you never proved notice either. So why can't they do that? I don't understand your reasoning that one excludes the other. That's not inconsistent. That happens commonly. But focus in then on the question of the manifest weight. As Justice Hoffman just indicated, as you know, the commission listened to Price. They listened to Coleman. Obviously, they thought that Coleman was better informed as to the claimant's job duties. I believe the conclusion was, therefore, his testimony was more persuasive than Dr. Price. Why is that wrong? We need to know. Is there some infirmity with Coleman's testimony? Why can't the commission do that? Coleman never saw her, first of all. He wasn't a Section 12 examiner. He was just an expert witness. Never saw her. Didn't know anything about her condition. Knew nothing about her. All he had was some of her medical records and a video of somebody else doing what the employer said was her job at a very slow pace and a fairly low resolution. And he clearly didn't watch the whole thing either. Because if you look at it, the employee in that video, in concordance with my client's testimony, or the petitioner's testimony, she's squeezing the bottle caps. And the testimony of Dr. Coleman was that she couldn't have gotten Carpal Tunnel Syndrome because of her employment because she didn't squeeze anything. When, if you look at the video and talk to my client or talk to the petitioner, then you would have realized that she was literally squeezing hundreds of thousands of bottle caps. She was doing it three and four times a week, all day, every day. All right, now you raised, legitimately you raised an infirmity, you believe, with Coleman's opinion, that that basis was flawed. However, you talked about Coleman was confused over the job duties. Didn't the Commission also find it compelling that Price never viewed the job description of the claimant's duties? So how was his opinion any better? Well, the Commission specifically found that it was important that Dr. Coleman or Dr. Price never saw the video. Right. We had taken his evidence, Deb, and then they made the video. But did he ever visit the workplace? Why was his observation superior to Coleman's? He never visited the workplace, correct? He never saw the video. So how does he have a better opinion on what the claimant was doing than Coleman? On what he was doing? Yeah, what her job duties were, what she was doing. Why is his opinion superior to Coleman's? His opinion on causation is superior to Coleman's because he saw the actual respondent, or the petitioner, not Coleman. He's not going to know causation by seeing the respondent. He's got to listen to her version. So he gets her version of events. That's all he gets. Right. Because he never went to the job site, he didn't see what she did, and he didn't look at the video. So he doesn't know any more than what she told him. Right. And the commission says, well, you know, Coleman did see the video, did view the job description of what she did, and he came to the conclusion that her activities were only minimal and did not involve high force gripping or grasping, and that they were not overly repetitive, meaning they weren't quick motions, and that as a result he found no causal connection. They believed him. Correct. Now, could they have believed Price? Of course they could have. But they didn't. So what's wrong with him? Yes. Pardon me. The critical thing in this case is that the commission found two important things, and that was that Dr. Coleman bases opinion on two critical factors, and that's that there wasn't any high force gripping and then the speed, like you said. He said in his deposition that there was no gripping, no squeezing, and the repetitiveness of the injury could easily be described by the fact that the video was slowed down compared to what the petitioner testified she was doing. She testified, and there's no other evidence to suggest that her testimony was wrong, that she was squeezing hundreds of thousands of these bottle caps every day at a much faster pace than was shown on the video. If we could go back to the notice argument again. I don't think it's fair for the commission to have found what they found, because if you go back and see what she would have done to have to comply with what the commission said she should have done, she would have had to basically become a doctor at some point before she saw her doctor in order to get some sort of an opinion as to whether or not her condition was work-related. She had no idea whether or not it was work-related. It was a repetitive injury, carpal tunnel disease. She hadn't seen her doctor. The only thing that had happened was that her doctor's nurse had told her that she should probably start wearing a splint. And when she went back to work, she told her employer about that, and she gave her employer all of the information from the doctor's office. And considering the test and informing an employer, she gave them everything. She couldn't have given them any more information. And I don't think that there's anything that she could have done at that point when the commission said she should have given notice to give notice. What was wrong with Ms. Dockum's testimony? Julie Dockum? Yeah, what was wrong with her testimony? She said that the woman didn't have to exert more force in doing her job than the force needed to grip a pencil. And she denied the fact that she said that the employers, the supervisors, rotate the employees so that three runs, a line of boxes one day, two lines another day. So it's not done as frequently as your client contended it was done, and it's not done with the force that your client contended it was done. So why couldn't they believe her? Especially due to the fact she also wrote a note and said your client told her that her injury was not work-related. Yes, John. She told her that before she saw her doctor about it. And she gave everything to the employer that she could have possibly given. So why couldn't the commission believe Dockum's testimony that your client's testimony is exactly how much force was used? It's just not credible. I'm not sure I understand your question, but I think what you're asking is... Let me try to make it easier. Okay. Dockum testified that the only force needed for your client to do her job regarding bottle cap inspection was to grip the bottle cap with a force equal to that necessary to hold a pencil. Coleman, in his opinion, said that from what he saw, the amount of force necessary to do the job as he understood it was not excessive and would not cause carpal tunnel syndrome. So why can't they believe that? Well, Coleman also testified that there was no squeezing going on in the video. The amount of force that is required to grip a pencil is the amount of force that's required to pick something out. There's squeezing going on in the video. The problem is it's different squeezing than your client described. She said she was told to do what? When she was trained... Let me find the words. She testified that the person checking the bottle cap squeezed only on one side of the cap while she was told to squeeze the entire rim of the cap. That's the difference. There's no question he saw squeezing. It's in the video. Your client admits it. So he saw squeezing. My problem is why can't they believe Dockum that she doesn't have to squeeze with tremendous force, only the force necessary for a pencil. She doesn't have to do it as frequently as she said it, coupled with Coleman's statement saying this isn't going to cause carpal tunnel syndrome, in my opinion. Your Honor, Dr. Coleman's opinion is based on a lack of repetitive squeezing. And the video shows squeezing, and it's clearly repetitive. If you believe anybody who's testified in this case, he didn't really have any information to go on based on the video, which is all he saw, that would show how repetitive it is. When he was asked what could have caused it, he said it was because she's a woman. You're representing the record, Coleman. What he said was the activities he saw on the video were, quote, minimal and, quote, did not involve, quote, high forced gripping or grasping. That was his opinion. He didn't say he didn't see any gripping at all. Okay, Your Honor. Well, his opinion... I'm sorry, Your Honor. The question, did you have, what was the question again? I started out with the question, why couldn't, why couldn't, what's wrong with the commission having believed Dr. Coleman? Well, Your Honor, Dr. Coleman's opinion, again, he didn't see my client or the petitioner. And his opinion was based on an incorrect view of the video. I mean, the video clearly shows gripping and squeezing. The commission's opinion in this case is based entirely on incorrect assumptions. They just took Dr. Coleman's opinion versus conclusions and didn't really get the underlying rationale. On the notice issue, it would have been impossible for the petitioner to comply with what the commission wanted her to do. There's no way for her to comply with, give notice prior to her knowing herself or having a doctor tell her that her condition is work-related. It's just not possible. I ask that this decision be overturned and remanded for further findings. Thank you, Counsel. Counsel, you may respond. Good morning. May it please the Court, my name is Terry Schroeder and I represent Silk Enclosures in this file. I will be very brief since the Court has already stolen most of my 15 minutes of fame. But on the two issues, first with regard to notice, as the Court has well versed, the standard in a repetitive trauma case is when the injury manifested itself and manifestation is when the knowledge of the injury and its relationship to the work area would become apparent to a reasonable person. In this case, the record shows, and the medical record shows, that the petitioner was diagnosed with carpal tunnel syndrome on or about 8-26-09. With bilateral carpal tunnel, she was given braces by her treating doctor's nurse case manager. Counsel points out, I believe in his brief, that she claimed she didn't see the doctor until some time later, although I would point the Court to that August 26th note. And page 2 of that note, it says at the bottom, it's got Dr. Price slash the nurse case manager's name. So clearly she was being seen in the service of Dr. Rice. All that aside, she was given these splints and told to wear them while she's at work. She goes back to work. She meets with Julie Dockum, gives Ms. Dockum the note. Julie Dockum asks her specifically whether or not her condition is related to or aggravated by her work duties. She tells Ms. Dockum that they are not. Ms. Dockum makes an actual note on that slip and files it in the petitioner's personnel file. That was later entered into evidence at trial. Whether or not there was a relationship, the other prong of that is whether or not there was a relationship in the petitioner's mind between her condition and her work duties. One could make the argument that just based on those facts right there, there's some question as to whether or not there was any relationship. However, she goes on to testify at arbitration when I asked her about whether or not she had told her employer that her condition was work-related. She testified that she had told some of her co-workers. She believed she had told some of her co-workers. So clearly she was aware that it had some relationship to her work. The court found or the arbitrator and the commission found that she had not given notice because the first notice that the employer had was on October 30th of 2009 when they received the application for adjustment of claim. So the court found that there was, I believe, or the arbitrator found I believe it was 60 or 65 days between the manifestation date of August 26th and the notice date of October 30th, 2009. I would argue, number one, that the notice issue is dispositive in this claim. But just for the sake of argument, let's say it's not. And the facts that the court discussed in their conversation with counsel makes it very clear that the arbitrator and the commission had sufficient evidence to find that her case was not causally connected to her work duties. Clearly, Dr. Coleman was much better informed than Dr. Price was. Dr. Price testified in his deposition that his entire knowledge of the petitioner's condition and the petitioner's job duties was based on the history that he received from the petitioner in the course of his treatment. Whereas Dr. Coleman had viewed a job description, Dr. Coleman had viewed a video of another person doing the job that the petitioner was doing. Now counsel asserts that the video was slowed down and of low resolution. I don't believe there's any evidence anywhere in the record or any testimony that says the video was slowed down. In fact, I asked the petitioner on cross-exam in the course of arbitration if the video accurately depicted the job that she was doing and she testified that it did. It did except she said the person in the video was gripping on one side when she was taught to grip on two. That's correct, Your Honor. So there is a deviation she testified. But as to the rest of it, you're right. She did testify that. In any event, Dr. Coleman was privy to all of that information that Dr. Price was not. The arbitrator chose to find Dr. Coleman's opinions with regard to causal connection more persuasive than those of Dr. Price. That finding is clearly within... Well, that finding plus the findings based on Judy Dockum's testimony. Judy Dockum had done this job previously herself, so she has first-hand knowledge of the job, which lends in my opinion and apparently in the opinion of the arbitrator, although he didn't specifically say that, but that lends more credence I believe to her testimony or some credence to her testimony as to the issues regarding the job. The arbitrator found that Dr. Coleman and Ms. Dockum's testimony were more persuasive and found that the petitioner had failed to prove that her condition of ill-being was causally connected to her work. They are perfectly within their province, as the Workers' Comp Commission, to make those findings and make that inference based on the evidence that was available to them. Clearly their decision is not against the manifest way of the evidence and the respondent in this case would request that the court affirm the decision. If there's no other questions, that's all I have. Thank you, Counsel. Counsel, you may reply. I'd just like to address a couple of things that were brought up by the respondent. On August 26th, I think it's clear on the record that the petitioner saw the nurse case manager or at least that there's an absence of any information showing that she saw the physician. There is positive evidence, I know that there's evidence in the testimony of Dr. Price stating that he first saw her on the 23rd or the 24th of November, which was several months after his nurse case manager saw her on August 26th. So there still was, just because she went to the doctor's office, doesn't mean she got any information from the doctor regarding her employment or injury and its relation to her employment. What do you fix as the manifestation date? The day that she saw her physician. And she told her it was work-related? Yes. Okay, so that would be in November? Yes. And that's well within the period of time for notice? Yes, her application for a judgment claim came several days later. I also don't think that there's anything prejudicial in this case. And if there was anything prejudicial, in fact it kind of prejudices the petitioner. Well, it doesn't have to be prejudicial because the argument here is no notice at all. Right. It's not defective notice. It's just no notice whatsoever. Of course, Your Honor. So if the manifestation date is, as you say, the date that she saw her physician in November, then she doesn't have defective notice. She had good notice. Correct, Your Honor. But it would be prejudicial against her, I think, if you applied the commission's standard on this notice issue. I think, if that makes any difference. I'd also just like to talk about the video. The commission and the arbitrator seemed to make a big deal about the fact that Dr. Coleman got to see the video and Dr. Price didn't. And I think it's not necessarily unjust, but definitely unfair to you to find that it's critical when the video was created by the respondent after Dr. Price had already given his testimony. Can we determine that from the record? Does the record reflect that the video was not created until after the deposition testimony? I don't know, Your Honor. I just know. I'm not doubting that what you're telling us is accurate, but can we determine that from the record? I can't tell you that for sure, Your Honor. I don't think that there's any evidence on the receipt of the video. Regardless, ultimately I'd just like to get a decision in this case that gives me the ability to explain to the petitioner what happened in her case. Something that makes sense, that I can tell her, that she can understand, that isn't internally inconsistent, and that doesn't ruin her faith in the whole judicial process. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter. It will be taken under advisement that this position shall issue. The court will stand in recess subject to call.